May it please the Court, David Cohen for Appellant, William Dewalt. I'd like to reserve four minutes of my time for rebuttal, if I could. This appeal focuses on the question of causation, and in particular, whether at William Dewalt's trial, and even more so, whether at a new trial, at which newly discovered evidence were presented, the government could prove beyond a reasonable doubt that Mr. Dewalt caused the death of Eric Ziegler. The government chose to indict Mr. Dewalt not for simple distribution, but for distribution resulting in death. Doing so had consequences for the government. It was especially formulated methadose pills caused Mr. Ziegler's death. And the government's choice to indict the case in this manner also had enormous consequences for Mr. Dewalt. A conviction for simple distribution of 20 methadose pills yields a guideline sentence range of only 0 to 6 months in prison. But the conviction for distribution resulting in death in the circumstances of this case yielded a statutory, mandatory minimum sentence of life without the possibility of parole. So proof of causation was critically important here. And the government's proof on this critical element was entirely drug use. That much is uncontested. But the government also asked the jury to infer beyond a reasonable doubt, entirely from circumstantial evidence, that Mr. Ziegler died by dissolving and injecting the specially formulated methadose pills that Mr. Dewalt distributed, pills that the evidence demonstrated at trial are the same. And the government agreed that he had not actually tried to do it. Right? So there was, you know, that was your theory, but there was certainly some contrary evidence concerning the... Judge Griebel, this is actually a critically important point. You're correct. Our expert did not actually try to dissolve and inject the pills. He testified as an expert based on years of experience as a forensic toxicologist that it couldn't be done. And if the decedent had swallowed the pills instead of injecting them, your client would still be guilty. It didn't require them to find that he had injected it. That's correct. Let me address the question of swallowing in one moment. But I want to return to the question you asked us before about the conflicting evidence in the record regarding the ability to inject these methadose pills. Because what we have on the one side is Jonathan Lipman, the forensic toxicologist, who testified that it was essentially impossible to do so, testifying as an expert. At the Rule 33 hearing and also at the Rule 29 hearing, the district court stated his belief, his recollection of the testimony that Jason Ziegler, the decedent's brother, had testified that he and his brother Eric Ziegler, the decedent, had in fact attempted to and had succeeded in injecting methadose. But the district court misremembered that evidence. There is, in fact, no evidence in the record at all that Jason Ziegler and his brother Eric Ziegler had ever injected methadose. And I would direct the Court's attention to several pages in the record excerpts, and if I could ask the Court's indulgence to walk through this. Jason Ziegler's testimony with regard to this issue is found at record excerpts, pages 364 to 366. The question was asked to Mr. Ziegler, have you ever taken methadone? And just parenthetically for us, there was an important distinction throughout the trial between methadone and methadose. And he doesn't specify which brand it was, but he said they used citrus and they used heat to break it down and they injected it, and he doesn't specify which kind. He specified the only testimony at this point is about methadone and their experience with methadone and injecting methadone. There's no testimony. Right. Which is a general name for both brands. That's not correct, Your Honor. In this trial in particular, there was throughout the trial a distinction being drawn between methadone and the dose tablets that DeWalt took. It was a critically important distinction from the outset of the trial. From opening argument all the way through, both counsel were drawing a distinction between methadone and methadose because the only type of this drug that Mr. DeWalt had. This drug named methadone, which is a general name for both. Roxane is one and methadose is another, and there probably are other ones, too, but. The two brand name formulations are methadone, which is made by Roxane, which is also the name of the active ingredient, but the brand name of the drug is methadone, and then there was the methadose brand, which is manufactured by DeWalt. And the same brother said they sometimes swallowed stuff, too, without injecting it. He testified that they did occasionally swallow pills. He never testified, nor could he have testified, that during the events in question here in July of 2002. No. It's a circumstantial case. But it strikes me, what you are doing really is making a jury argument, and if the jury had bought it, that would have been great for your client. But it strikes me that it's sort of like coming upon the 3-year-old with crumbs on his face on the empty cookie jar and having him say, you know, these crumbs are consistent with Johnny's mother's cookies and not just with yours. And that's a possible explanation, but it isn't the most plausible explanation, and it's certainly not the only explanation. Your Honor, there are two points of response. The first is that this distinction between methadone and methadose, further on in the testimony with Mr. Ziegler, Jason Ziegler, he was asked questions about trading methadone for methadose, and he admitted that he was completely unfamiliar with the methadose formulation. So all of his testimony about taking methadone, whether orally or by injecting in the attempt to inject it with his brother, pertains to methadone. Secondly, with regard to the evidence of swallowing the pills, Jason Ziegler did testify that he and his brother had in the past swallowed pills. There was no evidence offered in the record that that was the method of administration of the drug in this case. In fact, all of the evidence in the record was to the contrary. You had the needles that were found in the drug kit. You had the medical examiner, Dr. Dale, who testified that there were injection sites, recent injection sites, in Mr. Ziegler's arms. There was a spoon with residue in it. The medical examiner also testified that he inspected the stomach and the GI tract for evidence of any pills that had been swallowed, and although he acknowledged that he would not necessarily find them, he testified that there was no evidence of any pills that had been swallowed. There's also evidence in the record that Mr. Ziegler was a habitual intravenous drug user, someone who had injected drugs over the course of a long period of time, and testimony that once a drug addict moves from oral administration to injecting drugs, they don't go back to oral administration. Well, I think that the brother's testimony is at least potentially conflicting with that. On that one point, but on all of the physical evidence, all of the physical evidence points to only one method of administration, and that is injection. And I should add, the government's theory of the case from the outset was not that Mr. Ziegler swallowed these pills. And even in closing, the prosecutor was not prepared to say that there was evidence in the record that Mr. Ziegler had swallowed the pills. What he said in closing were two things. One is that he speculated that possibly he injected some, he ate some, he smoked some. There was no evidence of smoking. I mean, I guess what bothers me also about your argument is that it is so focused on the micro picture that it never looks at the macro picture. Your client sold 20 of these pills to the decedent, and only one was found at the time of his death, which wasn't very long afterwards. And I know that your theory was, well, he traded it in for something else, but that was just a theory, and the jury didn't have to believe that. There was, at trial, though, this hole in the middle of the government's case. You're right. But there's evidence. Our client admitted to having sold the 20 Methadose pills, and we will concede that on retrial, the government would be able to establish that there was a pill found with the decedent after his death. And I think it didn't add up to that. Time is relatively brief between those two episodes, and that he died from an overdose of this chemical. So they would also be able to show that 10 of those went to or you would be able to show that 10 of those pills went to Sarah. Exactly right, Your Honor. And what wasn't available at the first trial was any witness, any precipient witness, who could testify about this time period between the Thursday afternoon distribution and the Saturday afternoon death. There was no one who could testify about that time period. The jury is asked to infer from the circumstantial evidence that you have cited what occurred. But now Sarah Pfeiffer has come forward who can testify about three critical issues. First, she will testify at a new trial that the pills that Mr. Ziegler had were Methadone, not Methadose. Second, that the method of administration was injection, not swallowing. And third, that he was injecting without difficulty. Well, she can testify that he said, if she's allowed to so testify, that he was injecting. But she didn't, by her own admission, see what he did. Correct. He went into the bathroom, and the other alleged injection happened before he arrived at the house, right? That's correct, Judge Fischer, although that evidence is clearly admissible under several different exceptions to the hearsay rule. It's admissible under 803.3 as a statement of intent by the decedent. I'm intending to go into the bathroom to shoot the pills. It comes in that way. It comes in under 804.b.3 as a statement against penal interest, his possession of the illegal substance. You know, what is the – I understand that, but I want you to talk about the penalty as well. But the district court saw Ms. Pfeiffer? Yes, Your Honor. And heard what she was going to testify to? That's correct. We had an evidentiary. And made a determination that this probably wasn't going to affect the result at all, or probably wasn't whatever the – what did the court say? Wouldn't result in acquittal. Correct. Why should we – that's a lot of discretion and a lot of weighing of factors. The district judge was there for the entire trial and saw Ms. Pfeiffer. Why should we over-return his ruling that it would change the result? For a number of reasons, Your Honor. First of all, as I just alluded to, there was no other evidence on this point after the trial. We now have a witness who can fill the gap in the evidence at that trial. Second, the district court misremembered some important testimony that had been presented at trial. In the Rule 33 hearing, and I would cite the court to – excuse me – to Record Excerpts, page 633 and 651, this is the argument on the new trial motion. The district court, in questioning counsel about how probative this testimony would be, raised the question that Judge Graber asked about the conflicting testimony on whether methadose could be injected. And what the district court said was, but what about his brother's testimony? He described in some detail precisely how you could do it with the pills that – like the pill that was found with Mr. Ziegler at the time of his death. He said, my memory of his testimony was that he had actually done it himself. He had taken those pills and used them. That's my memory of – that's what my memory of it is, the brother. And then later on in the same hearing, the court says, my memory is that he described – this is at page 651 of the Record Excerpts – my memory is that he described in some detail how you would take even these larger pills, that they say you can't do it, and how you – I mean, it was basically describing a chemical grinding up process as to how you do it. And it seemed pretty persuasive to me when he got finished testifying. But I thought that he had – I thought he was talking about actual use. Now, let me ask you a question about Ms. Pfeiffer or Pfeiffer, however you pronounce it, her proposed testimony. You are making the argument that she positively identified the specific pills, but she doesn't give a brand name and she doesn't give a specific size. She refers to them as little white pills or something along those lines. Both of these are little white pills. Some are a little – littler than the other little white pills, but they're both little white pills. So I guess I'm not sure how far her testimony can get you, at least in the form it was offered in this record. She tested – she, on three separate occasions, told first the government when she contacted them, then defense counsel after we had been informed of Ms. Pfeiffer's existence in an interview with us, and then under oath at the hearing. On three separate occasions, she was steadfast that the pill that she saw with Eric Ziegler, that she was given ten of, that she held in her hand, ten of these pills, was a small pill. She said he told the government it was a small pill. At the interview with defense counsel, defense counsel showed her an exhibit that had been produced in Discovery that had a picture of a methadone pill and a methadose pill, the government's own exhibit. She looked at it and she told defense counsel it was the methadone pill, not the methadose pill. And then, again, at the new trial hearing, under oath, with Judge Malloy looking at her and subject to cross-examination, she was steadfast. The pill that she saw was definitely the small, the small pill, smaller than the methadose pill. Now, granted, they're both small pills, but in common experience, we all have experience with pills and pill size, like we have experience with cars and car size. And if there's an eyewitness to an event and there's a question about whether it was a compact car or a midsize car that was the getaway car, we can reliably expect the witness to be able to identify which car it was. By the same token, there's no reason why a witness like Ms. Pfeiffer, who is contacting, has an abundant credibility. She contacts the prosecution. She doesn't know Mr. DeWalt. She comes forward out of the instinct of being a good citizen and says on three separate occasions that she is quite certain that the pill that Ziegler had was a small pill. In the circumstance of this case where there's no other evidence to contradict that, no other precipient witness can come in and say, no, Ziegler had a big pill, that is very powerful testimony that we believe a jury ought to be allowed to hear. I have three and a half minutes left. I'd like to reserve some for rebuttal if the Court has additional questions. The point on Jason was that he never identified methadose as the kind of pill he was using. There's no testimony out of the brother to say that what he was successfully processing for injection was anything other than a methadone pill. Methadone and perhaps some other types of pills, but not methadose. He was at page 375 of the record excerpts, he says, I have never even seen a methadose pill. He's unfamiliar with methadose and had never tried to inject that pill. Could you give us just one sentence on the sentence? The argument that we make in our brief, Your Honor, frankly, is one that is anticipating the Supreme Court is going to overrule Amandar's Taurus. It hasn't yet. We're not asking the Supreme Court. That's all I wanted to know. Thank you. It may tomorrow morning, but it hasn't yet today. Yeah. I reserve the remainder of my time for the follow-up. Thank you. May it please the Court, my name is Josh Van de Wettering, Assistant United States Attorney for the District of Montana based out of Missoula. This is a case or was a case at the trial level about very specific, unavoidable facts. Eric Ziegler died. He died of an overdose of methadone. He died from methadone poisoning, essentially. Bill DeWalt sold Eric a particular brand of methadone, and a pill of that very brand was found next to Eric Ziegler. Those facts are in his... Can you clarify that, found next to him? In his bag. In his bag. In fact, in the room with him, yes. Okay. The appeal in this case, I think, is an appeal about what ifs. What if he really made this trade somewhere along the line? What if he was not able to inject it? What if there's another witness who can fill in some blanks for us? Well, none of those what ifs are actually true. In fact, we don't know how Eric consumed methadone, and we never will know. Eric is dead. He consumed it by himself, and no witness can say how he took it. In the end, though, it doesn't matter. Nothing in the statute says that it has to be. Well, wait a minute. The statute isn't what's at issue here. It's the proof of causation, as counsel said. So if, in fact, methadose pills can't be used by injection, and you have a witness who says that he was professing to inject them, both before he arrived and while he was at the house, whether or not she saw it, that's what he was declaring he was doing, and he had a history of injection. That's circumstantial evidence to suggest and to create a reasonable doubt, is it not? No, not to create a reasonable doubt, Your Honor. And I'll offer even more circumstantial evidence in the defendant's argument's favor. He had puncture marks on his arm that were small enough to have been very likely caused by the small needles he had with him. The very needles that Dr. Littman opined probably could not draw up the methadose slurry. The jury had lots of evidence and lots of opportunity to consider that argument, but they rejected that argument. I think the reason they objected it, or one of the reasons potentially they rejected that argument, is because it's not really the government's theory that he injected it,  and I think I argued in closing argument, where Mr. Cohen was citing me, that we don't know for sure. He may have tried to inject it and failed. He may have injected some and swallowed some. There's no evidence of it in his stomach, but that's probably because if he had swallowed it, it metabolized. That's what killed him. Even with the slurry, the additives, they wouldn't have detected the methadose additives? There was never any testing for the additives in the methadose that made up the slurry as opposed to the actual drug. What at trial, was there anything at trial with respect to his past injection? Oh, yes, there was. There was testimony that he was an IV user in the past. His brother testified to that. There was also lots of testimony about how he had been to treatment and was doing well. In fact, both Dr. Littman and Dr. Dale, the medical examiner, agreed that methadone, and I believe it is the Roxane brand of methadone and the Wilcott brand of methadone, which is called methadose. I don't believe Roxane, in other words, has a trademark on the name methadone. I think they're all forms of methadone. But both Dr. Littman and Dr. Dale testified that methadone is a very tricky drug. It builds up in your system and can kill even a knowledgeable drug user, certainly one who has been using it at low levels. And the amount that is a lethal dose varies a great deal from person to person. So any of us who don't take methadone on a regular basis would easily die from an amount that Bill DeWalt took on a regular basis to satisfy his pain. It's a very tricky drug that way. So the buildup in his system was as much of what killed him as whatever the last ingestion was. Jason Ziegler testified that drug addicts like his brother and he would get their high any way they could. And he agreed that, yes, injecting is better, but if you couldn't inject, you would eat the drug in order to prevent yourself from being sick. It wasn't as good a high, but he testified very clearly that you would still do it. So the suggestion that an IV user will not go back is completely belied by the evidence in this case. And the suggestion that you can't inject the methadose brand is at least challenged in this case by Jason Ziegler, who demonstrated a number of ways and admired Eric's ability to inject drugs that were considered to be uninjectable. He described Eric as having more knowledge than a pharmacist. So the jury had an ample opportunity to consider that possible what if and rejected it, perhaps because the evidence wasn't there, as there certainly wasn't for this idea of a trade, perhaps because it doesn't matter. The person allegedly traded with denied the trade, correct? The person he allegedly traded with came into court, testified, and vehemently denied that he had ever made that kind of trade. And, in fact, Jason Ziegler, when he was questioned about whether or not you would trade methadose for methadone, didn't even understand at first what defense counsel was asking and questioned back, why would you do that? I know that, see, Jason wasn't the expert in pharmacology that his brother was. But that he had never heard about it from his brother, obviously, either. He was obviously very confused. To me, the harder question in the case is whether the additional witness could have made a difference to the outcome. It's conceded that what she said was new. This wasn't something that was, you know, should have been discovered. And all those factors are there. And I guess I would put it this way, Your Honor. I don't concede that what she says is new. But I certainly concede that she is newly discovered. In other words, she came forward after the trial was over. But what she says, ultimately, is really only that the pill was small and white. And I don't think that was ever ---- Did she, under oath, compare the two and say it was Roxane and not methadose? Under oath, she never had the opportunity to compare the two pills side by side. She was taken by defense counsel to a pharmacy and, I think, had an opportunity to look at the Roxane grand pill and hold it in her hand. She looked at a picture that the government had provided in discovery to the defendant. And, in fact, when the defendant went or the defendant's counsel went and interviewed her originally, she questioned whether or not that picture represented the actual size. In fact, I would dispute counsel's characterization that she was steadfast. She was anything but steadfast. Well, wait a minute. She says at 617, I know for sure that the pills that I had were not bigger than the pill I looked at last night. And I would submit, Your Honor, that she arrived at that assurance of how small the pills are only well after she's been essentially brought to that conclusion by ---- Well, now you're going to the weight. You're not going to whether ---- Now you're trying to impeach her. Well, that's certainly true. I am trying to impeach her. And if she were ---- I was addressing your issue that she wasn't unequivocal. And I think she was unequivocal. Now, maybe she's unequivocal because she got coached or she was brought to it, as you euphemistically put it. But the point is that on the key issue of size, she was quite solid. And she, I guess when you interviewed her, she pointed, did you show her the, I think she said, didn't she, in her tape-recorded statement anyway, that when you guys talked to her, she pointed to the smaller of the two pictures, I think. Actually, that was not with us. Okay. Maybe it was with them. That was with defense counsel. Okay. But, yes, it's true. Under oath, at the last time she spoke about it in the courtroom, she testified unequivocally. However, in the whole context, she's anything but steadfast because she comes to that conclusion over time. And if there were to be a retrial, I would be working hard to exclude her testimony altogether as tainted in essentially the same way a tainted lineup would be. This is no different from bringing a witness in and saying, in fact, it's worse than bringing a witness in, because these pills are identical except for the printing on them and the size of them. This would be like bringing two people who look absolutely identical but for size. Well, I mean, you know, I don't want to – I take your point, but the pills are of a different size. And someone who takes pills or whatever, you get a muscle feel to it. And she, with all the weaknesses, I'm not bypassing those, but it's not incomprehensible for somebody to say, you know, given the pill, one that is somewhat larger and is thicker, apparently, not only just in diameter, but it's also thicker. So it has a different feel to it, to make the distinction. Now, how she gets to that and all the things she would do to impeach her, call her tainted, I understand. But I'm not persuaded that someone can't make a determination. I mean, I buy vitamins at Trader Joe's, and when they change the size between 1,000 and 500 milligrams in vitamin C, I can tell the difference because the pills are slightly different in size. And there's no doubt that I take a regular pill every night in addition to a vitamin. There's no doubt if it came up different, I would notice immediately. This young girl, however, testified that she took one of these pills one time and threw the rest away and otherwise did not bother to observe them closely at all. So we would still be working hard to keep her testimony out altogether, and I don't. In fact, one thing she was unequivocal about previously when she was interviewed by defense counsel was that it was Bill DeWalt who provided the pills that Eric first purchased. So she really doesn't change the trial at all because we knew the pills were small and white. She's unable to make a meaningful distinction between them. There's really nothing new. What is your response to your opponent's contention that the district court excluded her, disregarded her, or rejected her as a ground for new trial because in part, in material part, because he misremembered the record? Oh, misremembered? Yeah. Well, I have, I guess, two arguments about it. I think the inference still remains. Even if the court was incorrect about whether it was methadose in particular that Jason Ziegler was talking about, the court was very accurate in remembering that Jason Ziegler described clearly a method of pulling liquid out of the slurry. Opposing counsel says that it's absolutely clear that the brother is talking about Roxane and not about methadose because everybody at the trial knew that when the word methadone came up, it meant Roxane unless it was otherwise stated. What's your response to that in terms of the brother's testimony? You know, I was just glancing at the record to try and let's just assume that that's true. And we were making a distinction at the trial. You know, we did fall into a kind of methadone versus methadose, and the word Roxane, I think, came up only rarely. But let's just assume that that was the distinction and even that what Jason Ziegler meant was I've never had a methadose. I've only had the Roxane brand of methadone or some other brand. I still think Judge Malloy's ruling is correct because Jason Ziegler very clearly threw cold water on Dr. Lippman's suggestion that it couldn't be drawn into a needle. Dr. Lippman always equivocated at least a little bit, never saying that it couldn't happen, but that he had never tried it himself, that he believed it would be extremely difficult next to impossible, but always allowing that or always leaving room for that possibility. And the third reason, of course, is you don't have to inject it in order to get it in. Because if he tried and failed, he could have swallowed them and the defendant is still using them. Sure, sure. I mean, he could have failed to get it in and swallowed the whole thing, which would account for both the needle marks and the death, which is what you think is possible. I can't explain why they didn't find whole ones in his stomach, because if he had tried to dissolve them and he swallowed a kind of a gloppy mess, then he wouldn't find the whole things in there. You bet. You bet. Especially if it had been metabolized. And as you pointed out earlier, Judge Graber, that's all trial argument. That's all argument for the jury. And certainly... It is. But that brings a question to my mind. What is the standard we apply to this? What was the test that Judge Molloy should be applying and we should be looking at here to define whether it is likely to result in an acquittal? There's a lot of argument about whether it's a seven-day rule and all of that. But assuming the interest of justice and the five factors, whatever the test is, that we're looking at the promise as, is this evidence likely to result in an acquittal? How do we then evaluate? I'm looking at Judge Molloy's sum-up of his reasons. And he addresses, he says, on the issue you were just talking about, he said Ziegler was a convincing witness. He is not a pharmacologist, but the jury had the opportunity to weigh the testimony of Ziegler and Dr. Lippman and conclude that Eric could have injected the methadose. Okay, now, the jury could have, but that's saying that they're going to take the testimony of the brother who has no... over that of an expert in the face of a person who now comes in and says that these were tiny pills and that they were, that Eric had said before he got there that he'd already injected one, so therefore, and that he was going into the bathroom to inject two more, so it doesn't sound like he's having any problem with it. Why doesn't that rise to the level of creating reasonable doubt? That's what I said at the outset, and you said no. But what is, to bring it back to my ultimate question, what are we looking at here to decide whether it's likely to result in an acquittal? Well, first, I think your standard is that the district court has to have abused its discretion. Well, I know that's, but then I'm going beyond that. And they're rarely granted, but then when it comes down to what the standard of the prong is, is it likely to result in an acquittal? What do we put our heads in? Is this deferring to the government's prior conviction and say it takes a mountain to overturn it, or do we look at it and say put this into the mix and put ourselves back into what the jury would have been looking at when it went into the jury room, and would it have just been likely to create reasonable doubt in the mind? And obviously on some level you have to put yourself in the minds of the jury, at least leaning toward the government, I think, to honor that standard. But what I would offer is this. The reason it doesn't change anything is back to my argument of what if. It's back to the defendant's original theory of the case, which was what if they had actually traded pills. Well, that little methadose pill sitting there next to Eric or in his stuff at the end belies that whole argument. If he traded, why didn't he trade them all? I mean, the bottom line is he didn't trade them. He took Bill DeWalt's pills one way or the other, however he got them into him, and they killed him. And that's what the violation of law is. It's an inferential case to be sure, but there isn't really, as Judge Malloy noted, any other reasonable explanation. And with respect to the argument about whether or not it's really a methadose pill, I think it was such a non-issue until the appeal in this case. I think that that's another example of the what if it was different. Well, the fact is it was a methadose pill. We put the actual pill into evidence, and I think reading the record it's clear that everyone agrees, even counsel for the defendant agreed until the very last minute, that it is in fact a methadose pill. It's no different from saying now, what if Darius Niegler really didn't die? And, in fact, I was going back through the record. I never actually asked any person, even Dr. Dale, the medical examiner, well, was he in fact dead when he described the autopsy. But, of course, he was. I think there's a material distinction between those two examples. And I guess the only other thing I would add with respect to the last argument is Almendarez-Torres. I think the law is very clear on that. Unless there are other questions, then that's it. Thank you. Thank you, counsel. Mr. Gold. Thank you, Your Honor. The question of whether there was evidence in the record to support the supposition that Eric Ziegler may have swallowed the pills. In closing arguments at trial, the prosecutor said, and I quote, there's no evidence that he did not swallow the pills. Even in closing, he was unprepared to say that there was evidence in the record that Eric Ziegler did swallow. At most, he was saying there was no evidence that he did not swallow, shifting to the defense the burden to try and demonstrate that he didn't swallow. There was no evidence in this record that Eric Ziegler swallowed any pills. All the evidence in the case. Did you try the case? I did not try the case, Your Honor. But all the evidence, all the physical evidence in the case was that these pills were injected. On the question of whether Sarah Pfeiffer would be able to identify this pill easily, the evidence in the record is that the pills are actually quite easy to distinguish. Detective Burlingham, the detective who investigated this case, testified that the methadone brand pill is, quote, remarkably smaller than the methadose pill. There's also evidence in this record that the methadose brand pill is two times the weight and two times the size and noticeably thicker than the methadone pill. These pills are easy to distinguish from one another. Sarah Pfeiffer would be able to distinguish them, able to distinguish the two pills. Was her identification... Can you say that? I mean, how do you – how are you able to say that she would testify credibly and steadfastly? You've never... Oh, I'm sorry. We came into this case... Wait. Did you come in at the new trial level? Yes, Your Honor. Yes, Your Honor. And let me say on that score, on this sort of improper line of score, two times before we got into this case and showed her the pill before the day of the hearing, two times she described these pills as small. When she first met with the government and was interviewed just days after trial, she sat down with Mr. Van der Wettering and the FBI agent, made a statement, which was then transcribed two months later from memory, because the agent had lost his notes in the meantime. But one thing stuck in his head, and it's reported in the 302, and that's that Pfeiffer said that the pills were small. Now, clearly that was a significant fact to the agent, something that had been communicated in this interview, sufficiently important that two months later it finds its way into the 302. Then about a month later, when defense counsel who tried the case interviewed her and showed her the picture the government produced in discovery, she again picked the methadone, not the methadone spill. I see my time has expired. I would like to address the improper lineup if I could, but I know my time has expired. I think that there's time. Thank you, counsel. Thank you, Your Honor. The case just argued is submitted for decision, and that concludes the Court's calendar for this morning. The Court stands adjourned. And again, the arguments were very good, very helpful on both sides. All rise.
judges: Schroeder, Graber, Fisher